UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| LARS ST. JOHN, | CASE NO. 1:05 CV 0697 |
| Plaintiff, | JUDGE KATHLEEN M. O'MALLEY |
| v. | |
| | OPINION AND ORDER |
| METROHEALTH SYSTEMS, | |
| Defendant. | |

Pro se plaintiff Lars St. John filed this in forma pauperis action against defendant Metro Health Systems on March 9, 2005. In his complaint, Mr. St. John accuses Metro Health of "discrimination, slander, defamation of character and invasion of privacy." He seeks compensatory damages in the amount of $100,000.00 for each count in his complaint and $300,000.00 in punitive damages.

*Factual Background*

Mr. St. John describes himself as a patient under the Metro Health Systems' Insurance Plan that covers all medical appointments and care. He alleges that on November 4, 2004 he had an appointment in the dermatology department at Metro Health to examine "a dime size ingrown hair problem." (Compl. at 1.) He met with Dr. B. Newman, who allegedly misdiagnosed his skin type as oily, which he asserts is a racist stereotype. Mr. St. John maintained that his skin type was normal and may only have appeared oily

because of the moisturizer he used that day. Dr. Newman countered his belief by allegedly stating that "if Plaintiff had Vaseline (petroleum jelly) on his face, she could still tell that his skin is oily." (Compl. at 1.) She added that it was important to properly diagnose his skin type in order to prescribe the proper medication. After this exchange, Mr. St. John asked to speak with the attending physician, Judith Walker. He explained to Dr. Walker that Dr. Newman misdiagnosed his skin type and that there was "false information in the Plaintiff's medical record."[1] (Compl. at 2.) After Dr. Walker examined Mr. St. John's skin and "felt it was not oily . . . she stated she would talk to Dr. Newman about her conduct." (Compl. at 2.)

Mr. St. John states that, some time in November, 2004, he went to Metro Health for an appointment scheduled at 1:00 pm, which was "the first appointment."[2] He claims that patients who had later scheduled appointments were called before him, and by 2:00 pm he was still waiting to be seen by a physician. When he approached the desk clerk to inquire about the delay, and to determine why other patients were called ahead of him, Mr. St. John was told "with a nasty attitude [that] 'maybe their [sic] going to a different dept. and . . . there are only two residents and all the rooms are filled.'" (Compl. at 2.) When Mr. St. John responded that he could no longer wait and needed to reschedule his appointment, the desk clerk, "Cindy," allegedly logged on to his account and began reading his medical history aloud. After asking her not read his information out loud and advising her that he was going to file a complaint with the hospital, Cindy provided a date for his next appointment. Mr. St. John then went to the business desk to verify that the appointment had been made. He claims the clerk stated that his appointment was not in the system.

---

[1]In his complaint, Mr. St. John does not explain exactly what "false information" is allegedly contained in his medical records; presumably it relates to his skin type.

[2]Although Mr. St. John chronicles a "third incident occurred . . . [i]n November 2004," the "second incident" identified in his complaint occurred in December 2004.

2

Mr. St. John filed a complaint with the hospital Ombudsman regarding the non-scheduled appointment. When he went back to Cindy to investigate why his appointment was not in the system, she answered that "Plaintiffs' [sic] appointment needed to be cleared with her supervisor." (Compl. at 3.) Mr. St. John advised Cindy that he had filed a complaint with the Ombudsman and he proceeded to seek help from another desk clerk to reschedule his appointment.

In December 2004, Mr. St. John met with Dr. Malcolm Chen at Metro Health to follow-up on the treatment of his ingrown hair. He claims Dr. Chen misdiagnosed him as having "keloid scarring." Mr. St. John asserts that the diagnosis was racist because if he actually had keloid scarring it would have been diagnosed during his first appointment.

In January 2005, Mr. St. John experienced what he describes as another incidence of discrimination. He allegedly waited ten minutes before a desk clerk even checked him in; and, after he was checked-in, he waited an hour while other patients were called ahead of him to their appointments. When he inquired about the status of his appointment, Mr. St. John was told that one of the residents had to leave. During the course of his conversation with the desk clerk, Cindy allegedly yelled across the room, "he expects to be seen the minute he walks in and if not, he'll call the Ombudsman on you." (Compl. at 3.)

The day after this encounter, Mr. St. John contacted the Ombudsman by telephone to "make a complaint about the desk clerk[']s false statements." (Compl. at 3.) He asserted that based on his treatment the day before, no action appeared to have been taken regarding his previous complaint of being overlooked when he arrived for his appointment.

On February 3, 2005, Mr. St. John arrived at Metro Health for his rescheduled appointment at 3:30 pm, the last appointment scheduled that day. Dr. Brad Buma and a medical student examined Mr.

St. John for "scar revision and removal of a cyst." After Dr. Buma examined Mr. St. John, the medical student began asking him "yes" and "no" questions in order to complete an on-line questionnaire. When Mr. St. John replied that he did not drink alcohol or smoke marijuana, Dr. Buma allegedly "went onto drill and interrogate the Plaintiff on the same question five or six times, until the Plaintiff objected. Dr. Buma was basically stating by his questioning of the Plaintiff, that he felt the Plaintiff was not being truthful and he wanted the Plaintiff to admit to drinking and smoking marijuana when the opposite is true; all based on racist beliefs that all minority males drink and do drugs." (Compl. at 4.)

At the completion of the questionnaire, the student left and Dr. Buma entered the room with the attending resident, who recommended that Mr. St. John "go back to the doctor who made the original scar or maybe try putting some vitamin E on the scar because it is his choice who he operates on not the hospital. Both doctors were about to leave the room, when Plaintiff reminded them of the cyst. Once again there were a number of excuses; 'you may scar' the doctor replied; the Plaintiff replied 'that is be expected' 'can you drain the cyst' 'yes, but it might come back' . . . Dr. Buma answered." (Compl. at 4.) The conversation continued until a nurse interrupted to advise the doctors that they were needed in another room. Upon his return to Mr. St. John's room, Dr. Buma stated, " we could treat both of your concerns; however I'm afraid of malpractice suits, I've been in medical school for fourteen years, I have loans to pay back." (Compl. at 4.) Mr. St. John stated that, as a patient he was seeking treatment from the hospital, not to be discriminated against or to look for a lawsuit. He asked for both doctors' names and advised that he would be contacting the Ombudsman the next day.

Mr. St. John telephoned the Ombudsman on February 4, 2005. He alleges that the receptionist took his report and forwarded it to the Chief of Plastic Surgery. The secretary for the Chief of

Surgery contacted Mr. St. John to get a summary of what took place on February 3, 2004. Based on their conversation, Mr. St. John states that he was promised a response by the following Wednesday. Despite being available the entire day, however, he never received a telephone call. Moreover, he was told by the Ombudsman that the Chief of Plastic Surgery would be out of town until February 24, 2005, but, as of March 8, 2005, Mr. St. John still had not received any response from Metro Health Systems.

In his complaint before the Court, Mr. St. John asserts that Cindy's statements that he needed to be seen immediately or he would call the Ombudsman were false, defamatory and slanderous. He adds that when he was "overlooked based on race and gender, and had not been seen or called for his appointment for over an hour," when Cindy read his medical history out loud instead of going to the "appointment data software," and when she listened outside of his door during a February 3, 2005 appointment, Metro Health violated his right to privacy. He avers that Metro Health was aware of its employee's actions, but did nothing. He claims that for over six months he has endured racist attitudes at Metro Health and neither his medical condition nor complaints have been addressed.

*Standard of Review*

Although pro se pleadings are liberally construed, Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam); Haines v. Kerner, 404 U.S. 519, 520 (1972), the district court is required to dismiss an action under 28 U.S.C. §1915(e) if it fails to state a claim upon which relief can be granted, or if it lacks

5

an arguable basis in law or fact.³ Neitzke v. Williams, 490 U.S. 319 (1989); Lawler v. Marshall, 898 F.2d 1196 (6th Cir. 1990); Sistrunk v. City of Strongsville, 99 F.3d 194, 197 (6th Cir. 1996). For the reasons stated below, this action is dismissed pursuant to section 1915(e).

*Lack of Jurisdiction*

Federal courts are always "under an independent obligation to examine their own jurisdiction," FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231(1990) and a federal court may not entertain an action over which it has no jurisdiction. See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701 (1982). "Without jurisdiction, court cannot proceed at all in any cause; jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to court is that of announcing the fact and dismissing cause." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94(1998)(citation omitted).

There is no statement or reference in the complaint that sets forth this Court's's jurisdiction over the matter, and district courts are not required to conjure up questions never squarely presented to them or to construct full blown claims from sentence fragments. Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). To do so would "require ...[the courts] to explore exhaustively all potential claims of a pro se plaintiff, ... [and] would...transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." Id. at

---

³A claim may be dismissed sua sponte, without prior notice to the plaintiff and without service of process on the defendant, if the court explicitly states that it is invoking section 1915(e) [formerly 28 U.S.C. § 1915(d)] and is dismissing the claim for one of the reasons set forth in the statute. McGore v. Wrigglesworth, 114 F.3d 601, 608-09 (6th Cir. 1997); Spruytte v. Walters, 753 F.2d 498, 500 (6th Cir. 1985), cert. denied, 474 U.S. 1054 (1986); Harris v. Johnson, 784 F.2d 222, 224 (6th Cir. 1986); Brooks v. Seiter, 779 F.2d 1177, 1179 (6th Cir. 1985).

1278.

Given Mr. St. John's many racial references, it appears that he believes Metro Health discriminated against him in connection with the provision of services on account of his race. The facts Mr. St. John recites would not support such a claim, however, because there is nothing (other than Mr. St. John's subjective belief) to support the conclusion that individuals at Metro Health were motivated by racial bias in their dealings with him. For instance, there is no allegation that anyone made any facially racial comments or that any non-minority was, or even would have been, treated differently than Mr. St. John under similar circumstances. Were this Court to attempt to construe this complaint under Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a et seq., moreover, that statute does not provide the relief Mr. St. John is requesting. Unlike many other civil rights statutes, § 2000a allows only for prospective relief and does not authorize damage awards. See 42 U.S.C. § 2000a-3; Newman v. Piggie Park Ents., 390 U.S. 400 (1968); Dorsey v. City of Detroit, 157 F. Supp. 2d 729 (E.D. Mich. 2001).

Finally, it is well-established that legal conclusions alone are not sufficient to present a valid claim, and this Court is not required to accept unwarranted factual inferences. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987); see Place v. Shepherd, 446 F.2d 1239, 1244 (6th Cir. 1971) (A pleading will not be sufficient to state cause of action under Civil Rights Act if its allegations are but conclusions).

Because Mr. St. John has not asserted a federal claim over which this Court could exercise jurisdiction, the Court also may not exercise jurisdiction over his state law claims for defamation and slander. Pursuant to 28 U.S.C. §1367(a), federal courts have the power to exercise supplemental jurisdiction over state law claims in an action when the federal court has original jurisdiction over claims in the action and the

7

companion state law claims in the action "form part of

the same case or controversy." City of Chicago v. International Bd. of Surgeons, 522 U.S. 156, 164 (1997). The district courts' original jurisdiction covers cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A complaint falls within the district court's original jurisdiction when the party's "well- pleaded complaint raises issues of federal law." City of Chicago, 522 U.S. at 164. Having established that Mr. St. John's complaint contains no basis for this Court's original jurisdiction, this Court cannot exercise supplemental jurisdiction over any state law claims raised in this complaint.

Mr. St. John filed a "Second Motion to Amend Complaint" wherein he seeks to add an unidentified party defendant to this action. Upon due consideration of the fact that Mr. St. John has failed to state a valid federal claim, granting him leave to add an additional party would not cure this jurisdictional defect. Accordingly, his motion for leave to file a second amended complaint [Dkt.# 7] is **denied**.

Based on the foregoing, Mr. St. John's amended motion to proceed in forma pauperis [Dkt. #5] is granted. This complaint is dismissed pursuant to 28 U.S.C. § 1915(e), but without prejudice as to any state law claims he may seek to pursue in the appropriate forum. The Court

certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.[4]

**IT IS SO ORDERED**.

**s/ Kathleen M. O'Malley**
**KATHLEEN M. O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

DATED: April 21, 2005

---

[4]28 U.S.C. § 1915(a)(3) provides:

> An appeal may not be taken in forma pauperis if the trial court certifies that it is not taken in good faith.